SHUCK v. INTERSTATE BUILDING AND LOAN ASSOCI-
ATION.

ACCOUNTING — FRAUD — MISTAKE — DURESS — COERCION — ILLEGAL-
ITY—PAYMENT—CONSIDERATION—BUILDING AND LOAN ASSOCIA-
TION.—Where a party executes a bond for money borrowed of a
building and loan association, in which it is stipulated how payments
shall be made, how applied, that stock should be assigned, and be-
come cancelled and void, and that debt should be due when stock
reached par value on books of the association, and then pays before
maturity an amount demanded as balance due, he cannot be
relieved of such payment and settlement in absence of mistake,
fraud, misrepresentation, coercion, duress or illegality, and as none
of these have been shown here, this action for an accounting against
the association cannot be maintained. The fact that plaintiff was
threatened with foreclousre of the mortgage in case she did not pay,
is not coercion or duress, and the satisfaction of the mortgage is
sufficient consideration for such payment.

Before GAGE, J., Barnwell, May, 1900.    Reversed.

Action by Kittie I. Shuck against Interstate Building and
Loan Association.    From judgment for plaintiff, both sides
appeal.

*Mr. R. A. Ellis,* for plaintiff, cites: *By-laws given a
member are all he is charged with notice of:* 18 A., 905; 41
S. C., 300; 54 S. C., 221.    *But bond prevails against by-
laws:* 56 S. C., 280.    *Payment of an illegal demand involun-
tarily will not be sustained:* 10 How., 242; 95 U. S., 212;
1 N. & McC., 45; 13 Rich. L., 42; 25 S. E. R., 981; 12 S.
C., 570; 10 S. E. R., 221.

*Mr. George Galletty,* for defendant, cites: *Voluntary pay-
ment of money under claim of right cannot be recovered:* 2
Rich., 317; 18 Ency., 214-229.

March 18, 1902.    The opinion of the Court was deliv-
ered by

MR. JUSTICE POPE.    On 8th July, 1891, the plaintiff sub-

scribed for and had issued to her two shares of the stock of the defendant building and loan association, and paid all the charges accruing thereon up to the 27th of February, 1893. On that date (27th February, 1893), the plaintiff borrowed from the defendant the sum of $500 in money, executing her bond and a mortgage of her house and lot, in the town of Barnwell, in this State, to secure the payment of said loan. Also, she assigned to the defendant her ten shares of stock in the said building and loan association and also a policy of insurance upon her house already mortgaged. The plaintiff, after the 10th day of January, 1897, ceased to make payment of her dues as a stockholder and also ceased to pay interest on her loan. On the 29th March, 1897, the plaintiff addressed a letter to the defendant, asking information as to what amount she should pay to have the mortgage she had executed to it satisfied, and in reply, on the 31st March, 1897, the defendant notified her, if she paid $242.35 to the defendant, the mortgage would be satisfied, and on the same date sent an account by which said sum appeared to be due. On an early day in September, 1897, another letter was written at the instance of plaintiff to the defendant, asking the least amount which, if paid, would discharge the mortgage. By return mail she was informed that if $296 were paid, the mortgage would be discharged. More correspondence ensued, but in the letter of the defendant, dated September 9th, 1897, it was stated: "If the payment ($296) is not made at once, it will be my duty to place the papers in the hands of the attorney for foreclosure of the mortgage." In the letters between the parties between the dates 22d September, 1897, and 24th September, 1897, the plaintiff wrote: "Mrs. Shuck has arranged to make payment herself, and makes this payment under protest, and reserves all rights for overpayment." The money was thus paid and the mortgage cancelled, thus closing all relations between the parties. On the 9th day of November, 1898, this action was begun. The plaintiff's complaint recited many of the facts herein stated, setting up carefully the different papers which passed

between the plaintiff and defendant, to wit: the certificate for ten shares of stock; the by-laws of the defendant; the application for the loan in question; the bond executed by her; the mortgage of her house and lot. She then states what she understood the arrangement to be. She then refers to the correspondence between the parties in 1897; that she could not get a satisfactory settlement; that she paid $296 under protest, and especially reserving her legal right to a proper settlement. She also charged that the sums she had paid over were extorted from her by defendant's fraud and misrepresentation, and she prayed for an accounting between the defendant loan and building association and herself, and that she have judgment for whatever sum may be due upon such accounting being had, and for such other relief as the Court might consider her entitled to. The defendant answered, admitting the business relation between the parties; that the plaintiff had paid the sum of $296 to obtain a release of her mortgage by defendant, but the defendant craved reference to the by-laws; the certificate of stock; the application for loan; the bond and mortgage, to show how the plaintiff was mistaken. The answer denies any fraud or misrepresentation in its dealings with the plaintiff, and that the $296 paid by plaintiff was justly paid, and not, as alleged by the plaintiff, to have been extorted from her by duress or fraud or misrepresentation. An order was passed requiring the master for Barnwell County to take and report the testimony. This was done, other testimnoy was taken by commission. The cause came on to be heard by his Honor, Judge Gage, on the pleadings and the testimony. His decree was as follows:

"This is an action for an accounting and for the recovery back of money paid by the plaintiff to defendant under protest and involuntarily. The cause was referred to the master to take and report the testimony. In July, 1891, plaintiff became a subscriber for ten shares of the capital stock of the defendant company, series No. 25. The payments thereon were to be made monthly, fifty cents on each

share, and were so continued until each share should get to be of the value of $100 on the books of the association.   In February, 1893, the plaintiff borrowed from the defendant $500, and executed therefor her bond with numerous covenants.   And to secure the payment of money so borrowed, the plaintiff executed to the defendant a mortgage on a parcel of land situate in the town of Barnwell, and transferred and assigned to defendant the said ten shares of stock. The rate of interest on the loan is not stated *nomine* in the bond, but the monthly 'additional sum of $2.50 as interest on said loan,' fixes the rate at six per cent. per annum.   The principal sum of $500 was to be due and payable at such time as the stock of the association should reach a par value of $100 per share.   From July, 1891, until February, 1893, the plaintiff paid $5 per month on her stock subscription of fifty cents per share, and she also paid in addition ten cents per share toward defraying the expenses of the association, but that is not in issue.   After February, 1893, plaintiff continued the same payments on her stock, and she paid also each month at the same time $2.50, interest on $500 for one month at six per cent. per annum.   This continued until January, 1897, on the 10th of which month plaintiff made her last monthly payment.   In September of the same year, 1897, upon plaintiff's request, defendant ascertained the balance due the association by the plaintiff to be $296, and the plaintiff paid that sum, and ended her connection with defendant both as stockholder and as debtor.   In October, 1898, the plaintiff brought this action to recover back the sum so paid and any other sum which a right accounting might show to be due her by the defendant company.

"The defendant answers, first, that the sum so paid was by voluntary act of the plaintiff, and no action lies to recover it back.   That issue of law and of fact lies at the threshold of the controversy.   The allegation of the complaint is that the plaintiff reluctantly, under protest, and with reservation of all her rights in the premises, in order to have her home released from said mortgage, paid the said money to the

said defendant, and that the same was extorted from plaintiff by the misrepresentation and fraud of defendant. The rule of law is that if a debtor, of his free will, pays a sum of money to a creditor, with full knowledge of all the facts before him, action will not lie for the recovery of the same. It is a rule of *policy.* A citizen who has a remedy in his hands and throws it away, is not entitled to another at the hands of the Courts. A citizen who acts on his motion today, will not be assisted by the Court next day to change that action. The issues of fact here is, 'Did the plaintiff act voluntarily, with a full knowledge of the facts before her?' If she did not, and if the demand of the defendant made upon her was *illegal,* then she may maintain this action. I will consider these propositions in an inverse order.

"The claim of the defendant for $296 was manifestly illegal. The relationship of a stockholder in a building and loan association to the association is simple, so long as he is not a borrower. His obligation is to pay (in this case) fifty cents per month on each share of stock which he has subscribed for, and to continue such payments until the aggregate thereof and the profits made by the association shall make each share to be worth $100 on the books of the association. The status is not changed when the stockholder becomes a borrower from the association, and assigns his stock to secure the payment of the sum borrowed. The right theory, in that event, is that in addition to the duties and obligations hereto named, the borrower shall pay the interest on the sum borrowed monthly. That act is done, not as stockholder but as borrower. When the time has arrived when the principal shall be paid, to wit: when the stock is worth $100 per share, the stockholder has in hand stock worth $100 for each share he holds; the borrower has paid all interest due by him to the association, and only owes the principal sum borrowed. If at that time the stock equals the principal debt, one cancels the other; if the stock exceeds in value the debt, the balance goes to the stockholder; if the stock is of less value than the debt, the borrower makes it

good by payment from other sources.   The defendant contends, that when the plaintiff, as borrower, assigned and transferred her stock to the association, the association then advanced the owner the value thereof, and the stock became 'practically dead,' and the payments thereafter made of fifty cents per share per month were made not as a stockholder on an investment, but as debtor on principal sum which has been borrowed.   To sustain the contention, reference is had to the application for loan, to wit : 'Do you understand that only $50 can be loaned on one share of stock, and when the loan is made, the share of the stock on which it is based is, so far as you are concerned, cancelled, and cannot again be reinstated ; and that every share of stock on which a loan is made is exhausted by the loan, and on repayment of the loan, or maturity of the stock, that each share is at an end ?' To that question plaintiff answered, 'Yes.'   Further reference is had to the following provision of the bond, to wit : 'I also hereby transfer and assign to (the defendant) the ten shares of the capital stock of the association on which this loan is granted ; said shares of stock are to be held by association until this loan is repaid, in which event the said shares of stock shall stand as cancelled in the hands of the association.   Further reference is had to the following language of the transfer of stock : 'Said shares are to be held by said association as collateral to secure said loan until the said• shares have fully matured by payment of the monthly instalments, then such shares are to be cancelled and thereafter void.'   This is the contract betwixt the parties on which the defendant relies.   Under its terms, had plaintiff borrowed only $100 from defendant, and assigned her ten shares of stock to secure its payment, in the event the loan of $100 was thereafter repaid * * * the said shares of stock would then stand as cancelled in the hands of the association.   This is the pound of flesh nominated in the bond.   In the case at bar, on 10th January, 1897, the plaintiff, as investor, had made sixty-seven payments on her stock, aggregating $335. At the same time, she had paid all interest due and owing by

her on the principal sum of $500, which she had borrowed in
February, 1893. She then owed the defendant only $500.
She then had stock on which she had paid $335; and, if
profits had been made by the association, the stock was
worth more than $335. For eight months after January,
1897, the plaintiff as investor paid no more on her stock, and
as borrower paid no more interest on the money she had re-
ceived. At the close of that eight months, to wit: in Sep-
tember, 1897, plaintiff owed:

Principal ................................$500 00
Eight months interest ........................ 20 00
                                             ————————
                                           $520 00

At the same time her stock was worth $335, and she was due
defendant the net sum of $185. But in September, 1897,
the defendant claimed there was due to it from the plaintiff
the sum of $296, and that sum was collected. Was it a
legal demand? It is not contended by the defendant, that
plaintiff's stock was on 24th September, 1897—the time of
the payment—worth less than $335; it is not contended that
the plaintiff then owed the defendant anything except the
principal sum of $500, and eight months interest at six per
cent. per annum, and probably a small item of fines not ex-
ceeding $13. Therefore, plaintiff's liability to defendant in
September, 1897, was $500 principal sum, and interest
thereon at six per cent. per annum for eight months, and $13
for fines. At the same time, what was the liability of the
defendant to the plaintiff? By whatever name called, the
plaintiff had theretofore paid defendant from 10th July,
1891, to 10th January, 1897, $5 per month, making an ag-
gregate sum of $335. If these payments were made as by
debtor to a creditor on the principal sum of $500, they
should have been credited thereon on the days of payment;
but the payments were made, not on the debt, but as investor
on stock, confessedly until 1st of February, 1893, when the
new relationship of borrower began; and manifestly there-
after, for the mortgaged contract bound plaintiff "To faith-

fully pay (defendant) * * * the sum of $6 ($5 on stock and $1 for expense fund) on first Wednesday of each and every month in each and every year * * * as instalments until the ten shares borrowed on shall have fully matured,' and such payments were entered by the association and plaintiff's pass book as instalments on ten shares of stock, from first to last. The sole inquiry, then, is, to whom did these ten shares belong in September, 1897? In my judgment, they were the property of the plaintiff, after her debt to the association had been paid; and the pretended absolute relief thereof to the association in the manner aforesaid was not effective, because it was done without any consideration paid by the defendant to the plaintiff.

"The next inquiry in order is, what was the value of this stock when the defendant took it in part payment of the debt due by plaintiff. It is worth certainly the sums paid in as instalments. No losses were paid. The testimony of the witness, Beach, does not commend itself to lovers of frank dealings. He testified, under the pressure of cross-examination, that for the year ending July, 1896, the profits per share on this stock were $12.52. I understood from that the stock in July, 1896, was worth the sums paid in thereon, and a premium of $12.52 per share. Mr. Thompson admitted the profits on his stock to be $15.24. Under the by-laws (page 6), a withdrawing shareholder, after sixty-one payments, is entitled to have from the association the sum paid in, together with two-thirds of the profits, according to the last apportionment. The account, therefore, should have been stated thus:

By instalments paid . . . . . . . . . . . . . . . . . .$335 00
By two-thirds of $152.40 total profits. . . .   101 60  $436 60
To principal of debt . . . . . . . . . . . . . . . . .   500 00
To eight months interest . . . . . . . . . . . . . .    20 00
To fines . . . . . . . . . . . . . . . . . . . . . . . . . . .    13 00   533 00

To balance due by plaintiff . . . . . . . . . . . . . . . . . . . .  $96 40

By amount paid by plaintiff ..................$296 00
_____
To balance due plaintiff, September, 1897........$199 60
Add two years and eight months interest thereon..   38 14
_____
To balance due plaintiff, 10th May, 1900........$237 74

"And this brings me to the last issue to be considered. Was the payment made by plaintiff in September, 1897, voluntary? 'It can hardly be meant, that to make a payment involuntary, it shall be by actual violence, nor any physical duress. It is sufficient, if the payment is caused, on the one part, by an illegal demand, and made on the other part reluctantly, and in consequence of that illegality, and without being able to regain possession of his property except by submitting to the payment.' *Maxwell* v. *Griswold,* 10 Howard, 242. Again: 'To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary, there must be some actual or threatened exercise of power, possessed or believed to be possessed, by the party acting or receiving the payment, over the person or property of another, from which the latter has no other means of immediate relief than by making the payment.' *Kadisch* v. *Hutchins,* 95 U. S., 218. In the case at bar, the mortgage which the association held was of that class under which the creditor might enter, seize and sell, without the process of Court. On 9th September, 1897, the association advised the plaintiff: 'If payment is not made at once, it will be my duty to place the papers in the hands of the attorney for foreclosure of the mortgage.' When the association had in hand unapplied the remittance of the plaintiff, on the 24th September, 1897, it received notice from plaintiff that the payment was not voluntarily made. The counsel for defendant admitted that fact, with creditable candor.

"My conclusion, therefore, is, that the plaintiff is entitled to judgment against the defendant for $237.74, and it is so ordered."

From this decree both parties appealed.

The defendant appeals upon the following grounds:

"I. The Court below should have held that the basis of this action was fraud and misrepresentation on the part of the defendant, and the plaintiff having totally failed to establish such fraud and misrepresentation, and the Court having failed to find any fact or act of fraud and misrepresentation, erred in not dismissing the complaint.

"II. The Court erred in holding that the payments by plaintiff to defendant were not voluntary; but should have held that said payments were made voluntarily, and not in ignorance of her rights; and in absence of fraud, the same could not be recovered, without regard to the question of the legality or illegality of the demands of defendant.

"III. The Court should have held that the contract being executed, the question of the consideration supporting the same, or the legality or illegality of the demands of defendant, cannot be considered in the absence of fraud or coercion; and that the payments by plaintiff having been made under protest, with knowledge before making them, of their alleged illegality, the same cannot be recovered as an involuntary payment.

"IV. The Court erred in holding that the claim of the defendant for $296 was illegal, but should have held that the same was not greater than was demandable under the contract between the parties.

"V. The Court having found that the contract between the plaintiff and the defendant was that the plaintiff, as a borrower, assigned and transferred her stock to the association, the association then advanced the owner the value thereof, and the stock became practically dead, and all payments made thereon went to mature said shares to the value of $100 per share, unless the loan was paid and the shares became void in the hands of the defendant, erred in holding that the same was not effective because done without any consideration paid by the defendant to the plaintiff.

"VI. The Court erred in holding that the plaintiff had

any interest or right to an accounting for any profits on said shares of stock, further than to have the same applied to the maturity of the said shares to their par value of $100 per share; and the said Court should have held, that in that event the loan became paid and the shares cancelled and void, and without any property or right of plaintiff therein further than to have said loan paid.

"VII. The Court erred in not holding that on said final settlement the defendant had not received or retained as instalment on said stock and interest a greater sum than the amount actually advanced, with interest thereon at the rate of eight per cent. per annum, and in not holding that the same was in accordance with the contract of the parties.

"VIII. The Court erred in not holding that the shares never having been matured according to the contract, and having been withdrawn after two years and before maturity, the plaintiff was not entitled to two-thirds or any portion of the profits, but in any event was entitled to no more than a sum equal the amount paid into the loan fund in monthly payments on such shares, together with interest at the rate of six per cent. per annum, and the Court erred in finding a greater sum than that amount as due the plaintiff.

"IX. The Court erred in holding that the mortgage which the association held gave it a right to enter and sell without process of Court, but should have held that under the law the power could not have been exercised without the volutary act of the plaintiff in agreeing in writing to the amount due thereunder.

"X. The Court erred in finding the amount of $237.74 or any other sum whatever, or interest against the defendant, but the complaint should have been dismissed with costs."

The plaintiff exhibits the following exceptions to said decree:

"Please take notice that the plaintiff, appellant, and plaintiff, respondent, herein does not except to the main positions taken and established by the decree herein of his Honor, Judge Gage, more especially in so far as said decree ad-

judged that plaintiff, appellant, and plaintiff, respondent, is entitled to judgment for at least the amount therein decreed, to wit: the sum of $237.74; but does except to said decree, in so far as it does not award judgment to said plaintiff for a sum larger than said amount. Plaintiff contends that the proper amount that should be found in her favor, on an accounting, should be the sum of $511.90, with interest on said balance from September 24th, 1897, and she bases her exceptions on the following grounds, to wit:

"1. That the presiding Judge based his conclusion of fact as to the balance due to the plaintiff, appellant, and plaintiff, respondent, on the 'three-fourths' rule contained in the by-laws of 1896; whereas, it is submitted, that the by-laws of 1890 should govern, in which old by-laws no member's profits are thus limited or diminished, and he should have adjudged that she was entitled to the whole profits earned by her shares.

"2. Because his Honor, the presiding Judge, found that the profits of plaintiff's ten shares of stock, at the time that she made a payment of $296 on 24th September, 1897, was only $15.20 per share; whereas, he should have found that, from the preponderance of the testimony, the profits of her shares in series No. 25, were at least $37.45 per share, and possibly $50.78 per share, or for her ten shares not less than $374.50 and possibly $507.80.

"3. Because the presiding Judge failed to credit the plaintiff's account with the amount of fines, fixed by his Honor at $13.

"4. Because the honorable presiding Judge allowed the defendant association ten cents per month on each share for expenses; whereas, he should have charged up to the plaintiff on that account only eight cents per month on each share, crediting the plaintiff with a payment each month of $5.20 instead of $5 only."

We will now consider the defendant's grounds of appeal:

1. To upset an executed contract is a serious matter. The plaintiff alleged as her grounds for revoking legal force

10—63

and effect to the settlement she made on 24th September, 1897, by the payment of $296 and by receiving a satisfaction of the mortgage she had executed in 1893 of her home to secure her loan of $500 from and by the defendant, that the defendant was guilty of fraud and misrepresentation. This she ought to have proved in order to make out her serious charges. There is no testimony of fraud or misrepresentation in the case. The Circuit Judge relies for this basis of his decree upon the facts of illegality and duress. The plaintiff has been surrounded by her neighbors and friends from the inception of the relations which she voluntarily assumed to and with the defendant. The charter and by-laws of the plaintiff was in print and in her hands. She knew what she was doing when she became a member of this building and loan association. She was helping this defendant by her name and her money to practice the same oppression (if it is oppression) upon other persons which she now claims was practiced on her. She was obliged to know what plans this building and loan association had in view to make money for its stockholders. She voluntarily remained in this position for twenty months after she became a stockholder. But on 27th February, 1893, she became a borrower. The printed papers show that every paper she signed was at her own home. Every detail of this business was in print. She was obliged to know—the law made it her duty to know—what she was signing. The papers showed that in order to get this loan of $500, she had to own ten shares of stock. They showed that she had to pay six per cent. per annum as interest. They showed that she had to mortgage her house and lot valued at $1,100. They showed that the loan was not to mature until the stock reached its par value of $100 per share absolutely, without any limit fixed except the maturity of the shares. They showed even in her application for the loan that her share of stock had to be absolutely assigned to the building and loan association, and that when the value of these shares reached $100, *they were to be cancelled and become void.*

These facts appeared all through these papers.  The plaintiff said her husband advised her to sign.  His attorney, or rather the attorney she had to pay for all his labor, never advised her against signing these papers.  Where was there any fraud?  Where was there any misrepresentations?  Where was there any illegality?  But it is said she was coerced to make this payment.  Where is there any testimony to this effect?  This question is attempted to be answered by referring to the letter of the association stating to her in effect, if you do not pay this debt of $296, the bond and mortgage would be turned over to a lawyer to be foreclosed.  In answer to this, it may be said that Courts are the places where people settle their disputes, and to threaten a lawsuit for the assertion of one's rights cannot fall under the ban of oppression.  It must be borne in mind that in the year 1897, it was not in defendant's power to foreclose this mortgage in any other way than in Court, for the acts of 1894 and 1896 (see 22 Stat. at Large, 194, and 21 vol. Stat. at Large, page 816), directly so provide, and the plaintiff must be presumed to have had this knowledge.  All these things being stated, it follows that the defendant's first exception must be sustained.

2. A close examination of the testimony forces the conclusion upon our minds that the payment of the $296 made in September, 1897, was voluntary.  In other words, it was not made through any mistake or because she was coerced to make it.  This exception is sustained.

3. We find there was consideration supporting the payment of the $296, to wit: the cancellation of plaintiff's bond and mortgage executed to the defendant.  Besides, in this case, there was no proof of fraud, misrepresentation, illegality or coercion.

4. The payment by the plaintiff of $296 to the defendant on the 24th September, 1897, was in accordance with this remarkable contract.  It was agreed that she should pay for this thing, and that every time it was required that plaintiff should pay premiums, fees for expenses, fines, interests,

costs, insurance, &c.; but unfortunately for the plaintiff, she had agreed in writing to make all these payments. And she has herself to blame for going into any such contract.

5. We sustain this fifth exception, in view of what we have already held.

6. When the plaintiff bound herself to assign absolutely and did so assign her ten shares of stock to the defendant, and agreed that she would never again consider the same as her own property, but when matured such stock should be cancelled, we do not see how any accounting could be had. This exception is sustained.

7. We have already held that the final settlement was made in accordance with plaintiff's contract. This exception is sustained.

8. It is well to remember that the shares originally held by plaintiff never were matured. There was some testimony that a considerable sum could have been applied to these shares, but never at any time enough to mature such shares. The contract between these parties was that when the shares had matured, and if plaintiff kept the interest paid on her loan, then at maturity of the shares the loan of $500 should be cancelled. Never before that time was this to be done. The plaintiff withdrew her loan within two years (supposing the shares could even have matured in ninety-six months) of the eight years yet remaining in which it was supposed the stock would mature. This exception is sustained.

9. We have already sustained this exception in effect.

10. We have already sustained this exception in effect.

Now let us turn to the plaintiff's exceptions:

I. We have already held that the defendant owed no duty to plaintiff to account for profits. This is overruled.

II. We must overrule plaintiff's second exception from what we have already held, that there were no profits which the defendant owed the plaintiff.

III. We have already held that there was no duty owed to the plaintiff by the defendant except that already discharged. This exception is overruled.

IV. We cannot sustain this exception for the reasons already given. Therefore, the decree of the Circuit Judge must be reversed.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and the action is remitted to the Circuit Court to formulate a decree dismissing the complaint of plaintiff.

MR. JUSTICE GARY *concurs in the result.*